# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 19-cv-62591-BLOOM/Valle

EGLISE BAPTISTE BETHANIE DE
FT. LAUDERDALE, INC., and ANDY
SAINT-REMY,

       Plaintiffs,

v.

SEMINOLE TRIBE OF FLORIDA and
AIDA AUGUSTE,

       Defendants.

_____/

## OMNIBUS ORDER

**THIS CAUSE** is before the Court upon Defendant Seminole Tribe of Florida's ("Defendant Seminole Tribe") Motion to Dismiss, ECF No. [28] (the "Seminole Tribe's Motion"), Defendant Aida Auguste's ("Defendant Auguste") Motion to Dismiss, ECF No. [26] ("Auguste's Motion"), and Plaintiffs'[1] Motion for Leave to File a Second Amended Complaint, ECF No. [25] ("Motion to Amend"), (collectively, the "Motions"). The Court has carefully reviewed the Motions, all opposing and supporting submissions, the record in this case, and the applicable law, and is otherwise fully advised. For the reasons set forth below, the Seminole Tribe's Motion is granted; Auguste's Motion is granted; and Plaintiffs' Motion to Amend is denied.

## I. BACKGROUND

Plaintiffs initiated this action on October 17, 2019, asserting claims against Defendants Aida Auguste and the Seminole Tribe of Florida (collectively, "Defendants"). ECF No. [1]. On December 1, 2019, and with the Court's permission, *see* ECF No. [15], Plaintiffs filed their

---

[1] The First Amended Complaint in this action, ECF No. [21] ("Amended Complaint"), lists seventy-eight named Plaintiffs, which the Court will refer to collectively as "Plaintiffs."

Amended Complaint, ECF No. [21], which asserts eighty-three counts: Counts 1 and 4-83 assert violations of the Freedom of Access to Clinic Entrances, 18 U.S.C. § 248(a)(2) ("FACE Act") by each individual Plaintiff against Defendants; Count 2 asserts a claim of Interference with Business Relationships by Plaintiff Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. ("Eglise Baptiste") against Defendant Seminole Tribe; and Count 3 asserts a claim of Trespass by Eglise Baptiste against Defendant Seminole Tribe. *See generally* ECF No. [21].

The Amended Complaint alleges that on July 26, 2014, the then-Pastor of Eglise Baptiste, Reverend Usler Auguste ("Pastor Auguste"), passed away. ECF No. [21] ¶ 7. Since then, the Board of Directors of Eglise Baptiste and Defendant Auguste, Pastor Auguste's widow, have contended for the leadership of Eglise Baptiste. *Id.* On September 22, 2019, the congregation convened for a meeting to approve the process for the selection and installation of Pastor Auguste's successor. *Id.* ¶ 8. The congregational meeting ultimately "devolved into a pushing, shoving and punching affair between the supporters of the Board of Directors and the supporters of [Defendant] Auguste," which necessitated police intervention to restore order. *Id.* On September 24, 2019, based on the events that occurred at the congregational meeting, Eglise Baptiste filed a civil action for declaratory and injunctive relief against Defendant Auguste and her supporters in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, which is ongoing. *Id.* ¶ 9.

On September 29, 2019, "Eglise Baptiste conducted its weekly Sabbath services in the religious structure located on the Church Property." *Id.* ¶ 10. While those services were in progress, Defendant Auguste and her supporters, escorted by six armed officers from the Seminole Police Department, and without judicial authorization entered church property, "disabled the Church Property's surveillance cameras," "expelled from the Church Property all the worshipers who opposed Auguste," "changed the locks to the doors of the religious structure located on the Church Property," "seized the business records of Eglise Baptiste," and "locked the gates to the Church

Property." *Id.* Defendant Auguste and her supporters continue to occupy the church property and control Eglise Baptiste's personal property, including its bank accounts. *Id.* Further, Defendant Auguste and her supporters have continued to exclude Plaintiffs from the church property. *Id.*

The Amended Complaint also contains the following allegation:

> The judicial doctrine of tribal sovereign immunity does not insulate [Defendant Seminole Tribe] from the claims which Plaintiffs have asserted against [it] in this civil action because: (a) the actions of [Defendant Seminole Tribe's] police officers took place more than eleven (11) miles from [Defendant Seminole Tribe's] Hollywood, Florida, reservation, (b) prior to September 29, 2019, Plaintiffs had not had an opportunity to negotiate with [Defendant Seminole Tribe] for a waiver of [its] tribal sovereign immunity; and (c) other than through this civil action, Plaintiffs have no means by which to secure monetary compensation for [Defendant Seminole Tribe's] infringements of Plaintiffs' rights under Federal and Florida law.

*Id.* ¶ 11.

In the Seminole Tribe's Motion, Defendant Seminole Tribe argues that Plaintiffs' Amended Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction because it is a federally recognized Indian tribe that is entitled to tribal sovereign immunity. Plaintiffs filed a Response in Opposition. ECF No. [31]. Defendant Seminole Tribe filed a Reply. ECF No. [35].

In Auguste's Motion, Defendant Auguste seeks dismissal of Plaintiffs' Amended Complaint, arguing that it (1) fails to state a claim under Federal Rule of Civil Procedure 12(b)(6); (2) involves non-justiciable questions of internal church governance; and (3) improperly attempts to split causes of action. Plaintiffs filed their Response in Opposition, ECF No. [30], to which Defendant Auguste filed a Reply. ECF No. [33].

Finally, in the Motion to Amend, Plaintiffs request leave to file a Second Amended Complaint, ECF No. [25-1] ("Second Amended Complaint"), to correct typographical mistakes, drop the claims of tortious interference and trespass, add a claim for injunctive relief, drop and add certain individuals as Plaintiffs, and name seventeen additional individuals as Defendants.

Defendants each filed their respective Responses in Opposition, ECF Nos. [27] & [29], to which Plaintiffs filed a Reply, ECF No. [32]. In addition, Plaintiffs filed a Notice of Supplemental Authority in support of their Motion to Amend, ECF No. [34], which cited to *Crawford's Auto Center, Inc. v. State Farm Mutual Automobile Insurance Co.*, No. 17-12583, 2019 WL 6974428, at *1 (11th Cir. Dec. 20, 2019).

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

A motion brought pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the district court's subject-matter jurisdiction and takes one of two forms: a "facial attack" or a "factual attack." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). "A 'facial attack' on the complaint 'require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'" *McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (quoting *Lawrence*, 919 F.2d at 1529). "A 'factual attack,' on the other hand, challenges the existence of subject matter jurisdiction based on matters outside the pleadings." *Kuhlman v. United States*, 822 F. Supp. 2d 1255, 1256-57 (M.D. Fla. 2011) (citing *Lawrence*, 919 F.2d at 1529); *see Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008) ("[A] factual attack on a complaint challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony."). Further, the "[p]laintiff bears the burden of proving the existence of subject matter jurisdiction." *Desporte-Bryan v. Bank of Am.*, 147 F. Supp. 2d 1356, 1360 (S.D. Fla. 2001) (citing *Boudreau v. United States*, 53 F.3d 81, 82 (5th Cir. 1995)).

"In assessing the propriety of a motion for dismissal under Fed.R.Civ.P. 12(b)(1), a district court is not limited to an inquiry into undisputed facts; it may hear conflicting evidence and decide

for itself the factual issues that determine jurisdiction." *Colonial Pipeline Co. v. Collins*, 921 F.2d 1237, 1243 (11th Cir. 1991). As such, "[w]hen a defendant properly challenges subject matter jurisdiction under Rule 12(b)(1) the district court is free to independently weigh facts, and 'may proceed as it never could under Rule 12(b)(6) or Fed.R.Civ.P. 56.'" *Turcios v. Delicias Hispanas Corp.*, 275 F. App'x 879, 880 (11th Cir. 2008) (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003)).

**B. Rule 12(b)(6)**

Federal Rule of Civil Procedure 8 requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. These elements are required to survive a motion brought under Rule 12(b)(6) that requests dismissal for failure to state a claim upon which relief can be granted.

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration All.*, 304 F.3d 1076, 1084 (11th Cir. 2002). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550

U.S. at 555; *see Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682).

A court, in considering a Rule 12(b)(6) motion, "may consider only the complaint itself and any documents referred to in the complaint which are central to the claims." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)); *see also Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity." (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002))).

## C. Motion to Amend

Federal Rule of Civil Procedure 15 governs amended pleadings generally and provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave," which "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). A plaintiff should be afforded the opportunity to test his claim on the merits as long as the underlying facts or circumstances may properly warrant relief. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

"A district court need not, however, allow an amendment (1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). The law in this Circuit is clear that "a district court may properly deny leave to amend the

complaint under Rule 15(a) when such amendment would be futile." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004); *see also Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1292 n.6 (11th Cir. 2007) (same); *Thompson v. City of Miami Beach, Fla.*, 990 F. Supp. 2d 1335, 1343 (S.D. Fla. 2014) ("[A] district court may properly deny leave to amend the complaint under Rule 15(a) when such amendment would be futile." (citation omitted)). Ultimately, whether to grant or deny leave to amend is within the discretion of the district court. *Foman*, 371 U.S. at 182.

## III. DISCUSSION

Defendant Seminole Tribe moves to dismiss Plaintiffs' Amended Complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) due to its entitlement to tribal sovereign immunity. Defendant Auguste also moves to dismiss Plaintiffs' Amended Complaint pursuant to Rule 12(b)(6) because (1) Plaintiffs fail to sufficiently allege a claim under the FACE Act upon which relief can be granted; (2) Plaintiffs' claims involve non-justiciable questions of church governance; and (3) the claims in the Amended Complaint constitute improper claim splitting. In addition, Plaintiffs move for leave to file a Second Amended Complaint. The Court will address each Motion in turn.

### A. Defendant Seminole Tribe's Motion to Dismiss

The Seminole Tribe's Motion seeks dismissal of Plaintiffs' Amended Complaint, arguing that, absent any clear and unequivocal Congressional or tribal waiver, which is not present here, Defendant Seminole Tribe is entitled to tribal sovereign immunity. Defendant Seminole Tribe further argues that its entitlement to sovereign immunity applies in this case regardless of the nature of the relief sought, the type of tribal actions challenged, or the location where the challenged conduct occurred. Despite this immunity, Defendant Seminole Tribe argues that Plaintiffs may still seek legal recourse against other individuals, as evidenced by Eglise Baptiste's

pending state court action. Plaintiffs, on the other hand, argue that Defendant Seminole Tribe is not entitled to tribal sovereign immunity because the Amended Complaint alleges off-reservation criminal conduct pursuant to § 248(c)(1). Thus, Plaintiffs contend that tribal sovereign immunity does not extend to such off-reservation criminal conduct. In reply, Defendant Seminole Tribe notes that Plaintiffs fail to cite to any law to support their assertions that tribal sovereign immunity would not apply to the challenged conduct here. Likewise, Defendant Seminole Tribe asserts that § 248(c)(1) does not allow private individuals to initiate criminal prosecutions under the FACE Act. Rather, the FACE Act only creates civil remedies for private individuals. As such, Defendant Seminole Tribe contends that it is entitled to tribal sovereign immunity.

"Tribal sovereign immunity is a jurisdictional issue." *Furry v. Miccosukee Tribe of Indians of Fla.*, 685 F.3d 1224, 1228 (11th Cir. 2012). "[E]ven if a federal court has statutory jurisdiction, Indian sovereign immunity is a 'consideration [that] determines whether a court has jurisdiction to hear an action.'" *Inglish Interests, LLC v. Seminole Tribe of Fla., Inc.*, No. 2:10-cv-367-FtM-29DNF, 2011 WL 208289, at *2 (M.D. Fla. Jan. 21, 2011) (quoting *Taylor v. Ala. Intertribal Council, Title IV J.T.P.A.*, 261 F.3d 1032, 1034 (11th Cir. 2001)).

"Indian tribes[2] are 'domestic dependent nations' that exercise 'inherent sovereign authority.'" *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991)). "As dependents, the tribes are subject to plenary control by Congress. And yet they remain 'separate sovereigns pre-existing the Constitution.' Thus, unless and 'until Congress acts, the tribes retain' their historic sovereign authority." *Id.* (citing *United States v. Lara*, 541 U.S. 193, 200 (2004); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978); *United States v. Wheeler*, 435 U.S. 313, 323 (1978)).

---

[2] The Seminole Tribe of Florida "has long been recognized as an Indian tribe." *Inglish Interests, LLC*, 2011 WL 208289, at *1.

Among the core aspects of sovereignty that tribes possess — subject, again, to congressional action — is the "common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo*, 436 U.S. at 58. That immunity . . . is "a necessary corollary to Indian sovereignty and self-governance." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P.C.*, 476 U.S. 877, 890 (1986); *cf.* The Federalist No. 81, p. 511 (B. Wright ed. 1961) (A. Hamilton) (It is "inherent in the nature of sovereignty not to be amenable" to suit without consent). And the qualified nature of Indian sovereignty modifies that principle only by placing a tribe's immunity, like its other governmental powers and attributes, in Congress's hands. *See United States v. U.S. Fidelity & Guaranty Co.*, 309 U.S. 506, 512 (1940) ("It is as though the immunity which was theirs as sovereigns passed to the United States for their benefit").

*Id.* at 788-89. As such, "an Indian tribe is subject to suit *only where* Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998) (emphasis added). Likewise, "[t]ribal sovereign immunity, where it applies, bars actions against tribes regardless of the type of relief sought." *Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*, 563 F.3d 1205, 1208 (11th Cir. 2009) (citing *Kiowa Tribe of Okla.*, 523 U.S. at 760 (barring suit for money damages); *Fla. Paraplegic, Ass'n, Inc. v. Miccosukee Tribe of Indians of Fla.*, 166 F.3d 1126, 1127 (11th Cir. 1999) (barring suit for injunctive relief)).[3]

"Abrogation requires a congressional determination that, as a matter of federal law, Indian tribes shall be subject to certain kinds of suit. Waiver, on the other hand, occurs when the tribe itself consents to the jurisdiction of the state or federal courts." *Furry*, 685 F.3d at 1236 (citing *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla.*, 63 F.3d 1030, 1048 (11th Cir. 1995)). "Moreover, both abrogation and waiver require the use of express and unmistakably clear

---

[3] "[C]ase law has [also] extended Indian sovereign immunity to entities other than the literal 'tribe.'" *Inglish Interests, LLC*, 2011 WL 208289, at *6 (citing *Taylor*, 261 F.3d at 1036 (applying Indian sovereign immunity to intertribal consortium)). "Tribal sovereign immunity may extend to subdivisions of a tribe, including those engaged in economic activities, provided that the relationship between the tribe and the entity is sufficiently close to properly permit the entity to share in the tribe's immunity." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010) (footnote omitted) (citing *Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1292 (10th Cir. 2008)); *see also Allen v. Gold Country Casino*, 464 F.3d 1044, 1046-47 (9th Cir. 2006) (recognizing that tribal sovereign immunity extends to subordinate economic tribal entities); *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 29 (1st Cir. 2000) (same).

language by either Congress or the tribe." *Id.* (citing *Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1286, 1289 (11th Cir. 2001); *Florida v. Seminole Tribe of Fla.*, 181 F.3d 1237, 1241-43 (11th Cir. 1999); *Fla. Paraplegic, Ass'n, Inc.*, 166 F.3d at 1130-31).

The Court of Appeals for the Eleventh Circuit has explained that "Congress abrogates tribal immunity only where the definitive language of the statute itself states an intent either to abolish Indian tribes' common law immunity or to subject tribes to suit under the act." *Fla. Paraplegic, Ass'n, Inc.*, 166 F.3d at 1131. Moreover, it is well established that "Congress may abrogate a sovereign's immunity only by using statutory language that makes its intention unmistakably clear, and [any] ambiguities in federal laws implicating Indian rights must be resolved in the Indians' favor." *Seminole Tribe of Fla.*, 181 F.3d at 1242 (citing *Fla. Paraplegic Ass'n, Inc.*, 166 F.3d at 1131) (footnote omitted); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55-56 (1996) ("Congress' intent to abrogate [tribal sovereign] immunity from suit must be obvious from 'a clear legislative statement.'" (quoting *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 786 (1991))).

"A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate" sovereign immunity. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985). Similarly, "[t]he [United States] Supreme Court has made it plain that waivers of tribal sovereign immunity cannot be implied on the basis of a tribe's actions, but must be unequivocally expressed." *Sanderlin*, 243 F.3d at 1286 (quoting *Seminole Tribe of Fla.*, 181 F.3d at 1243 & n.8); *see also Santa Clara Pueblo*, 436 U.S. at 58; *Okla. Tax Comm'n*, 498 U.S. at 509 ("Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation.").

"To date, [the Supreme Court's] cases have sustained tribal immunity from suit without drawing a distinction based on where the tribal activities occurred." *Kiowa Tribe of Okla.*, 523 U.S. at 754; *see also Bay Mills Indian Cmty.*, 572 U.S. at 785 ("[A]bsent such [a Congressional]

abrogation (or a [tribal] waiver), Indian tribes have immunity even when a suit arises from off-reservation commercial activity."). Likewise, the Supreme Court has not yet "drawn a distinction between governmental and commercial activities of a tribe." *Kiowa Tribe of Okla.*, 523 U.S. at 754-55; *see also Bay Mills Indian Cmty.*, 572 U.S. at 800 (noting that the Supreme Court, in *Kiowa Tribe of Oklahoma*, "'decline[d] to draw any distinction' that would 'confine [tribal sovereign immunity] to reservations or to noncommercial activities'" (quoting *Kiowa Tribe of Okla.*, 523 U.S. at 758)). Similarly, the Eleventh Circuit has held that tribal sovereign immunity applied, where there was no tribal waiver or Congressional abrogation of this immunity, in a case alleging that the Seminole Tribe of Florida's gambling operations on its reservation violated various criminal laws. *Seminole Tribe of Fla.*, 181 F.3d at 1240, 1243-44, 1245; *see also Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1300 (11th Cir. 2015) (holding that a tribe is entitled to sovereign immunity in a suit alleging violations of criminal laws on the reservation).

The Eleventh Circuit has also rejected the argument that "tribal [sovereign] immunity [must give way to] federal jurisdiction when no other forum is available for the resolution of claims." *Seminole Tribe of Fla.*, 181 F.3d at 1243 (citing *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 547 (2d Cir. 1991) (rejecting this proposition); *Ute Distrib. Corp. v. Ute Indian Tribe*, 149 F.3d 1260, 1266 n.8 (10th Cir. 1998) ("The proposition that tribal immunity is waived if a party is otherwise left without a judicial remedy is inconsistent with the reasoning of *Santa Clara Pueblo*."); *Makah Indian Tribe v. Verity*, 910 F.2d 555, 560 (9th Cir. 1990) ("Sovereign immunity may leave a party with no forum for its claims."); *Florida Paraplegic Ass'n, Inc.*, 166 F.3d at 1134 (implying that lack of forum in which to pursue claim has no bearing on tribal sovereign immunity analysis)).

In this case, it is undisputed that Defendant Seminole Tribe did not expressly waive its immunity from suit. *See, e.g.*, ECF No. [21] ¶ 11. Further, "waivers of tribal sovereign immunity

cannot be implied on the basis of a tribe's actions, but must be unequivocally expressed." *Sanderlin*, 243 F.3d at 1286 (quoting *Seminole Tribe of Fla.*, 181 F.3d at 1243 & n.8). Likewise, Plaintiffs cite to no statutory language in § 248 that evidences any clear and unequivocal Congressional intent to abrogate tribal sovereign immunity, nor did the Court independently find any such language. *Fla. Paraplegic, Ass'n, Inc.*, 166 F.3d at 1131. Absent some definitive language making it unmistakably clear that Congress intended to abrogate tribal sovereign immunity in enacting the FACE Act, the Court concludes that Defendant Seminole Tribe is entitled to immunity from suit in the instant action.[4]

Further, the Court is unpersuaded by Plaintiffs' arguments with regard to the inapplicability of tribal sovereign immunity for off-reservation criminal tribal conduct. As explained above, the Supreme Court has repeatedly emphasized that tribal sovereign immunity applies regardless of where the challenged tribal actions occurred. *See Kiowa Tribe of Okla.*, 523 U.S. at 754; *see also Bay Mills Indian Cmty.*, 572 U.S. at 785. The Supreme Court has also never drawn a distinction on the application of this immunity from suit based on the nature of the challenged actions. *Kiowa Tribe of Okla.*, 523 U.S. at 754-55; *see also Bay Mills Indian Cmty.*, 572 U.S. at 800. Likewise, in *Seminole Tribe of Florida*, the Eleventh Circuit affirmed the district court's holding that sovereign immunity barred a suit against a tribe for alleged violations of criminal laws on the tribe's reservation. 181 F.3d at 1240, 1243-44, 1245; *see also PCI Gaming Auth.*, 801 F.3d at 1300. Notably, while Plaintiffs represent that they have found no case extending immunity from suit to off-reservation criminal tribal actions, they also provide no case law that supports limiting such

---

[4] *See, e.g.*, *Furry*, 685 F.3d at 1233 ("Moreover, [Eleventh Circuit] case law is clear that congressional abrogation must come from 'the definitive language of the statute itself' and that 'legislative history and inferences from general statutory language are insufficient.' Nowhere in the text of [the statute] is there *any* mention of tribal immunity from suit, much less an express and unequivocal abrogation of tribal immunity with respect to private lawsuits alleging that an Indian tribe has violated state tort law. Congress well understood how to expressly subject an Indian tribe to private suit in state or federal court; it simply did not do so by enacting [this statute]." (quoting *Fla. Paraplegic, Ass'n, Inc.*, 166 F.3d at 1131)).

immunity in this case. *See Phillips v. Hillcrest Medical Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. [The Court] will not do his research for him." (citation omitted)).

Absent any authority to the contrary, this Court concludes that Plaintiffs have failed to satisfy their burden of establishing jurisdiction here. *See Furry*, 685 F.3d at 1236 ("Cobbling together a new exception to tribal immunity would directly conflict with the Supreme Court's straightforward doctrinal statement, repeatedly reiterated in the holdings of this Circuit, that an Indian tribe is subject to suit in state or federal court "*only where* Congress has authorized the suit or the tribe has waived its immunity." (quoting *Kiowa Tribe of Okla.*, 523 U.S. at 754)). Thus, Defendant Seminole Tribe is entitled to tribal sovereign immunity in the instant action based on the extensive case law from both the Supreme Court and the Eleventh Circuit establishing that an Indian tribe is entitled to immunity from suit unless there is a clear waiver by the tribe or some unequivocal statutory abrogation of such immunity by Congress. *See Kiowa Tribe of Okla.*, 523 U.S. at 754; *Bay Mills Indian Cmty.*, 572 U.S. at 785; *Furry*, 685 F.3d at 1233; *Sanderlin*, 243 F.3d 1286 (quoting *Seminole Tribe of Fla.*, 181 F.3d at 1243 & n.8); *Fla. Paraplegic, Ass'n, Inc.*, 166 F.3d at 1131.[5] Accordingly, Defendant Seminole Tribe is dismissed from this action.

**B. Defendant Auguste's Motion to Dismiss**

In Auguste's Motion, Defendant Auguste argues that Plaintiffs' Amended Complaint should be dismissed because it fails to state a claim under 18 U.S.C. § 248(a)(2) and it asserts claims on non-justiciable questions of church governance. Similarly, Defendant Auguste argues that the Amended Complaint should be dismissed due to the improper claim splitting between state

---

[5] Further, Defendants are correct in noting that, where alternative avenues through which a party may seek legal redress exist, as is the case here given Plaintiffs' ongoing state court action, sovereign immunity is not waived. ECF No. [21] ¶ 9; *see also Seminole Tribe of Fla.*, 181 F.3d at 1243-44.

and federal courts. Plaintiffs take the contrary position, arguing that the Amended Complaint sufficiently alleges facts to support a claim under § 248(a)(2). Moreover, Plaintiffs state that they do not seek judicial resolution of non-justiciable doctrinal affairs; rather, they seek only to vindicate their rights under the FACE Act. Before the Court can examine the merits of Defendant Auguste's arguments, it must first address the threshold jurisdictional issue of whether Plaintiffs' Amended Complaint raises non-justiciable questions of internal church governance.[6]

The Supreme Court and the Eleventh Circuit have explained that under the principles of separation of church and state, "[c]ivil courts lack jurisdiction to entertain disputes involving church doctrine and polity." *Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 719 F. App'x 926, 928 (11th Cir.), *cert. denied*, 139 S. Ct. 175 (2018). The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. "[C]ivil actions involving ecclesiastical disputes implicate both the Establishment and Free Exercise Clauses" of the First Amendment. *Myhre*, 719 F. App'x at 928 (citing *Crowder v. S. Baptist Convention*, 828 F.2d 718, 721 (11th Cir. 1987)).

> "By adjudicating religious disputes, civil courts risk affecting associational conduct and thereby chilling the free exercise of religious beliefs. Moreover, by entering into a religious controversy and putting the enforcement power of the state behind a particular religious faction, a civil court risks 'establishing' a religion." [*Crowder*, 828 F.2d at 721.] These concerns require civil courts to abstain from deciding issues connected to "theological controversy, church discipline, ecclesiastical government, or conformity of members of the church to the standard of morals required of them," *id.* at 722 (quoting *Watson v. Jones*, 20 L. Ed. 666 (1871)), and

---

[6] Although the arguments for dismissal in Auguste's Motion are raised pursuant to Rule 12(b)(6), the non-justiciability of matters of ecclesiastical cognizance presents jurisdictional issues that this Court has an independent obligation to address. *See Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 759 (11th Cir. 1991) ("Before rendering a decision, . . . every federal court operates under an independent obligation to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based; and this obligation on the court to examine its own jurisdiction continues at each stage of the proceedings, even if no party raises the jurisdictional issue and both parties are prepared to concede it." (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990))).

to accept as binding the decisions of religious organizations regarding the governance and discipline of their clergy.

*Id.*

Therefore, as a general rule, "religious controversies are not the proper subject of civil court inquiry," and "courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian E. Orthodox Diocese for the U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976); *see also Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 369 (1970) (Brennan, J., concurring) ("To permit civil courts to probe deeply enough into the allocation of power within a church so as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine.").

Moreover, the First Amendment requires that civil courts decide religious disputes "without resolving underlying controversies over religious doctrine," *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969), and this principle "applies with equal force to church disputes over church polity and church administration," *Milivojevich*, 426 U.S. at 710; *see also Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 114-15 (1952) (noting that the rule against judicial review of religious disputes "is applicable to 'questions of discipline, or of faith, or of ecclesiastical rule, custom, or law.'" (quoting *Watson*, 20 L. Ed. 666)). As such, "[c]ivil courts may apply neutral principles of law to decide church disputes that 'involve[] no consideration of doctrinal matters.'" *Myhre*, 719 F. App'x at 928 (quoting *Jones v. Wolf*, 443 U.S. 595, 602, 603 (1979)); *see also Crowder*, 828 F.2d at 722 ("The [Supreme] Court's decisions . . . [have] recognized that where the method of resolution of the controversy avoids excessively entangling the judiciary in questions of ecclesiastical doctrine or belief, the [F]irst [A]mendment might permit

a court to adjudicate the matter." (footnote omitted) (citing *Presbyterian Church*, 393 U.S. 440; *Jones*, 443 U.S. 595)).

With these First Amendment concerns in mind, the Supreme Court has explained that "civil courts may not decide . . . whether [a] church complied with the procedural rules contained in the church constitution and penal code in defrocking one of its bishops." *Crowder*, 828 F.2d at 725 (citing *Milivojevich*, 426 U.S. at 721-24). Nor may courts "use the guise of the 'neutral principles' approach to delve into issues concerning whether the general church acted beyond its authority under the church constitution in declaring a reorganization of the diocese." *Id.* (citing *Milivojevich*, 426 U.S. at 721-24). "Similarly, where the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy, civil courts are not to make the inquiry into religious law and usage that would be essential to the resolution of the controversy." *Church of God at Sharpsburg, Inc.*, 396 U.S. at 369-70. "[Q]uestions of church discipline and the composition of the church hierarchy are at the core of ecclesiastical concern." *Milivojevich*, 426 U.S. at 717.

Furthermore, "[d]isputes among church members over the control of church property arise almost invariably out of disagreements regarding doctrine and practice. Because of the religious nature of these disputes, civil courts should decide them according to principles that do not interfere with the free exercise of religion." *Jones*, 443 U.S. at 616 (citing *Milivojevich*, 426 U.S. at 709, 720; *Presbyterian Church*, 393 U.S. at 445-446, 449; *Kedroff*, 344 U.S. at 107, 121-22). "The only course that achieves this constitutional requirement is acceptance by civil courts of the decisions reached within the polity chosen by the church members themselves." *Id.* at 617.

Likewise, "[a] dispute involving the application of church doctrine and procedure to discipline one of its members is not appropriate for secular adjudication." *Myhre*, 719 F. App'x at 928 (citing *Milivojevich*, 426 U.S. at 723; *Crowder*, 828 F.2d at 726). "[W]here a religious body

adjudicates relations among its members, courts will not interfere with the decisions of those bodies made in accordance with those bodies' rules." *Grunwald v. Bornfreund*, 696 F. Supp. 838, 840 (E.D. N.Y. 1988) (citing *Gonzalez v. Archbishop*, 280 U.S. 1 (1929); *Bouldin v. Alexander*, 21 L. Ed. 69 (1872); *Watson*, 20 L. Ed. 666); *see also Ram v. Lal*, 906 F. Supp. 2d 59, 70 (E.D. N.Y. 2012) (collecting cases); *Askew v. Trustees of the Gen. Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc.*, 776 F. Supp. 2d 25, 30-31 (E.D. Pa. 2011), *aff'd*, 684 F.3d 413 (3d Cir. 2012).

"[A]n indispensable part of any church is the collection of individuals who have joined together in worship and constitute the church's membership." *Burgess v. Rock Creek Baptist Church*, 734 F. Supp. 30, 33 (D.D.C. 1990). A religious organization's "own internal guidelines and procedures must be allowed to dictate what its obligations to its members are without being subject to court intervention. . . . [These] [r]eligious bodies must be free to decide for themselves, free from state interference, matters which pertain to church government, faith and doctrine." *Dowd v. Society of St. Columbans*, 861 F.2d 761, 764 (1st Cir. 1988) (per curiam) (citations omitted); *see also Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring in judgment) ("Determining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is [] a means by which a religious community defines itself.").

"For essentially the same reasons that courts have refused to interfere with the basic ecclesiastical decision of choosing the minister or priest of a church," courts have also refused to "interfere with the fundamental ecclesiastical concern of determining who is and who is not [a church] member." *Burgess*, 734 F. Supp. at 33 (citing *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1356-57 (D.C. Cir. 1990); *Natal v. Christian & Missionary All.*, 878 F.2d 1575, 1576-77 (1st Cir. 1989); *Hutchison v. Thomas*, 789 F.2d 392, 393,

396 (6th Cir. 1986); *Kaufmann v. Sheehan*, 707 F.2d 355, 358-59 (8th Cir. 1983)). If a religious body's "decision to terminate [a] plaintiff's membership was a matter of ecclesiastical cognizance, the First Amendment and Supreme Court case law preclude" adjudication of the plaintiff's claims in federal court. *Id.* "The mere expulsion from a religious society, with the exclusion from a religious community, is not a harm for which courts can grant a remedy." *Grunwald*, 696 F. Supp. at 840-41; *see also Paul v. Watchtower Bible & Tract Soc'y*, 819 F.2d 875, 879-83 (9th Cir. 1987) (even if conduct was tortious, Jehovah's Witnesses' "shunning" of disassociated member was part of church's polity and was a privileged religious practice under First Amendment). "Thus, federal courts will not interfere with the decisions of a religious body adjudicating the relationships of members in that body; as a matter of jurisprudence federal courts will defer to the decision of the religious body." *Grunwald*, 696 F. Supp. at 840.

"Put simply, '[a] civil court presiding over church disputes must be particularly careful not to violate the Free Exercise and Establishment Clauses by ruling against one party and for the other party based on the court's resolution of the underlying controversy over religious doctrine and practice.'" *Ram*, 906 F. Supp. 2d at 70 (quoting *Burgess*, 734 F. Supp. at 31). In doing so, a court must "look to the substance and effect of [the] plaintiffs' complaint, not its emblemata. Howsoever a suit may be labelled, once a court is called upon to probe into a religious [dispute,] . . . the First Amendment is implicated." *Natal*, 878 F.2d at 1577.

Here, the Court concludes that any adjudication of the claims asserted in Plaintiffs' Amended Complaint would violate the First Amendment because it "would require judicial intrusion into, rules, policies, and decisions which are unmistakably of ecclesiastical cognizance." *Id.* Contrary to Plaintiffs' contentions that their FACE Act claims do not involve non-justiciable questions of church governance, the foundational issue that must be resolved before addressing the merits of the claims is whether Defendant Auguste had the authority to exclude Plaintiffs from

church property as Pastor Auguste's rightful successor. Questions of church government are fundamentally ecclesiastical in nature. *Milivojevich*, 426 U.S. at 717 ("[Q]uestions of church discipline and the composition of the church hierarchy are at the core of ecclesiastical concern."); *Church of God at Sharpsburg, Inc.*, 396 U.S. at 369 (Brennan, J., concurring) ("To permit civil courts to probe deeply enough into the allocation of power within a church so as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine.").[7]

Further, "the principles governing the separation of church and state extend to [a religious organization's] decision to exclude [a] plaintiff from entering its property." *Towns v. Cornerstone Baptist Church*, No. 14-cv-6809, 2015 WL 13738012, at *3 (E.D. N.Y. July 20, 2015), *report and recommendation adopted sub nom. Towns v. Church*, No. 14-cv-6809, 2016 WL 792406, at *1 (E.D. N.Y. Feb. 29, 2016). Therefore, a religious organization's "decision to exclude [a] plaintiff from its property, and thereby from its religious services and events, is a decision of ecclesiastical cognizance which cannot be disturbed by a federal court." *Id.* Likewise, decisions by a religious body to terminate a plaintiff's membership are of a "fundamental[ly] ecclesiastical concern." *Burgess*, 734 F. Supp. at 33.

---

[7] *See also Jones*, 443 U.S. at 616 ("Disputes among church members over the control of church property arise almost invariably out of disagreements regarding doctrine and practice. Because of the religious nature of these disputes, civil courts should decide them according to principles that do not interfere with the free exercise of religion."); *Milivojevich*, 426 U.S. at 710 (explaining that the principle that federal courts should not decide religious disputes "applies with equal force to church disputes over church polity and church administration"); *Church of God at Sharpsburg, Inc.*, 396 U.S. at 369-70 ("[W]here the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy, civil courts are not to make the inquiry into religious law and usage that would be essential to the resolution of the controversy."); *Crowder*, 828 F.2d at 725 (noting that courts may not "use the guise of the 'neutral principles' approach to delve into issues concerning whether the general church acted beyond its authority under the church constitution in declaring a reorganization of the diocese" (citing *Milivojevich*, 426 U.S. at 721-24)).

Ultimately, Defendant Auguste's decision to exclude Plaintiffs from church property and the ensuing events are so inextricably intertwined with matters of church governance, administration, and membership — regardless of the legal theories presented — that the adjudication of such issues would "excessively entangle[e] the judiciary in [ecclesiastical] questions." *Crowder*, 828 F.2d at 722. Any adjudication of Plaintiffs' claims in the instant action would "violate the Free Exercise and Establishment Clauses by ruling against one party and for the other party based on the [C]ourt's resolution of the underlying controversy over religious doctrine and practice." *Ram*, 906 F. Supp. 2d at 70 (quoting *Burgess*, 734 F. Supp. at 31). Because this Court cannot, consistent with the First Amendment, entertain issues concerning church governance, administration, or polity, *Milivojevich*, 426 U.S. at 710; *Myhre*, 719 F. App'x at 929, Plaintiffs' Amended Complaint must be dismissed.

### C. Plaintiffs' Motion to Amend

Finally, Plaintiffs' Motion to Amend requests leave to file a Second Amended Complaint to correct typographical mistakes, drop the claims of tortious interference and trespass, add a claim for injunctive relief, drop and add certain individuals as Plaintiffs, and name seventeen additional individuals as Defendants. Defendant Auguste opposes the Motion to Amend, arguing that allowing Plaintiffs to file the Second Amended Complaint would be futile because the amended pleading will nonetheless be subject to dismissal as a matter of non-justiciable church governance. Defendant Seminole Tribe also opposes the Motion to Amend, noting that granting leave to amend would be futile due to Defendant Seminole Tribe's entitlement to tribal sovereign immunity.

Generally, a district court should freely grant leave to amend pleadings when justice so requires. Fed. R. Civ. P. 15(a)(2). However, as noted above, leave to amend need not be given if amendment would be futile. *Bryant*, 252 F.3d at 1163. "[D]enial of leave to amend is justified by futility when the 'complaint as amended is still subject to dismissal.'" *Burger King Corp. v. Weaver*,

169 F.3d 1310, 1320 (11th Cir. 1999); *see Dysart v. BankTrust*, 516 F. App'x 861, 865 (11th Cir. 2013) (same); *St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co.*, 198 F.3d 815, 822-23 (11th Cir. 1999) ("When a district court denies the plaintiff leave to amend a complaint due to futility, the court is making the legal conclusion that the complaint, as amended, would necessarily fail."). "The futility threshold is akin to that for a motion to dismiss; thus, if the amended complaint could not survive Rule 12(b)(6) scrutiny, then the amendment is futile and leave to amend is properly denied." *Bill Salter Advert., Inc. v. City of Brewton, Ala.*, 2007 WL 2409819, at *2 (S.D. Ala. Aug.23, 2007) (citing *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 85 F.3d 1514, 1520 (11th Cir. 1996) (amendment is futile if cause of action asserted therein could not withstand motion to dismiss)).

Based on the analysis above, the Court concludes that permitting any further amendment would be futile in this case. It is clear that Plaintiffs' Second Amended Complaint would not survive a motion to dismiss due to the same issues discussed above with regard to tribal sovereign immunity and the non-justiciable questions of church governance. In comparing Plaintiffs' Amended Complaint with the proposed Second Amended Complaint attached to their Motion to Amend, the Court concludes that the claims asserted in both amended pleadings raise similar claims and tell "essentially the same story." *Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 17-12583, 2019 WL 6974428, at *7 (11th Cir. Dec. 20, 2019) (citing *Hall*, 367 F.3d at 1263 (affirming dismissal "because the three new claims asserted, like those in [the] first amended complaint, would have been subject to dismissal as a matter of law")). The Second Amended Complaint asserts claims under the FACE Act that similar to those asserted in the Amended Complaint. *See generally* ECF No. [25-1]. The primary difference between these pleadings is that the Second Amended Complaint asserts such claims against Defendant Auguste, Defendant Seminole Tribe, and the seventeen additional church-member Defendants who accompanied Defendant Auguste to seize control of the church property. *Id.* This proposed Second

Amended Complaint, like Plaintiffs' Amended Complaint, would still be subject to dismissal as a matter of law based on tribal sovereign immunity and the non-justiciability of ecclesiastical questions.

In their Notice of Supplemental Authority, Plaintiffs cite to *Crawford's Auto Center, Inc.* for the proposition that "a proposed amended complaint is 'futile' when the District Court has previously involuntarily dismissed a similar complaint pursuant to rule 12(b)(6)." ECF No. [34] at 2. Plaintiffs argue that their Motion to Amend therefore may not be denied on grounds of futility because this Court has not involuntarily dismissed any of Plaintiffs' complaints. However, as detailed in the analysis above on the two Motions to Dismiss, the Court concludes that Plaintiffs' Amended Complaint must be dismissed as a matter of law. As such, the Eleventh Circuit's holding in *Crawford's Auto Center, Inc.* that Plaintiffs rely upon in their Notice of Supplemental Authority does not affect this Court's conclusion that the Motion to Amend must be denied because granting Plaintiffs leave to file the Second Amended Complaint would be futile in this case.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Seminole Tribe of Florida's Motion to Dismiss, **ECF No. [28]**, is **GRANTED**.

2. Defendant Aida Auguste's Motion to Dismiss, **ECF No. [26]**, is **GRANTED.**

3. Plaintiffs' Motion for Leave to File a Second Amended Complaint, **ECF No. [25]**, is **DENIED**.

4. The above-styled action is **DISMISSED WITH PREJUDICE**.

5. To the extent not otherwise disposed of, any scheduled hearings are **CANCELED**, all pending motions are **DENIED AS MOOT**, and all deadlines are **TERMINATED**.

6. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on January 3, 2020.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record